## Bowman v. Hamlett, et al.

(Decided May 26, 1914.)

### Appeal from Franklin Circuit Court.

1. Statutes—Subjects and Titles of Acts—Expression in Title of Subject of Act in General.—Where a variance between the title and the body of an Act is not such as to create a strong inference that it has resulted in the enactment of law under misapprehension, and the variance is the result of the inclusion in the title of a particularity not required by the Constitution, the error or surplusage in the title may be disregarded. But, where the entire title, or the essential part thereof, after striking out the matter clearly erroneous or disregarding the surplusage, is in conflict with the body of the act, then there is a failure to conform to Section 51 of the Constitution, for the title does not then express the subject of the Act. Where the title otherwise expresses the subject of the act it is not required that it should state what former legislation is repealed or amended thereby.

2. Statutes—Construction and Operation—Policy and Purpose of the Act.—Where words used in a statute do not convey the meaning intended by the Legislature, and from the context and a general survey of the attending circumstances and the object to be accomplished, the true intent may be made apparent, the words used may be modified, or altered to express the legislative intent.

HAZELRIGG & HAZELRIGG and A. J. CARROLL for appellants.

ARTHUR M. RUTLEDGE for Board of Education on appellant's side.

JAMES GARNETT, Attorney General, CHARLES H. MORRIS, Assistant Attorney General, and JOHN C. DUFFY, Attorneys for appellees.

OPINION OF THE COURT BY JUDGE HANNAH—Affirming.

Andrew Bowman instituted this action in the Franklin Circuit Court against the Superintendent of Public Instruction and the Attorney General, the purpose being to test the constitutionality and to obtain an interpretaion of the Act of March 9, 1914, commonly known as the School Text Book Commission Law. The lower court sustained a demurrer to the petition, and from the judgment dismissing it, plaintiff appeals.

We find in the brief of the Attorney General that the lower court in passing upon the question submitted, delivered the following opinion:

"This cause arises upon petition of plaintiff asking that the School Text Book Commission Act of 1914 be declared void, because it is in contravention of section 51 of the Constitution; and further, because it is so contradictory as to make it impossible of execution. This court can agree with neither position of plaintiff.

"The title of the act relates to only one subject, viz.: The establishment of the State Text Book Commission, to secure for the benefit of the patrons of common schools, uniformity in series and price of such books.

"The last lines of the title, in these words: 'And repealing chapter 13, etc.,' have in reality no relation to the title and in no sense can be considered except as surplusage. The inconsistencies complained of are capable of reconciliation by simply seeking the legislative intent, and that was, to establish this commission for the benefit of the school child and not for the benefit of book concerns or retail dealers.

"When the act undertook to say that the retail dealer should have fifteen per cent commission, and in the same breath says that the books shall be sold as cheaply as elsewhere, then manifestly the commission must be less than fifteen per cent if the price is to be met only in that way.

"The complaint of section eight in the act is perhaps more serious, and the difficulty is solved by striking out section eight, thus leaving the act as was evidently intended.

"For these reasons, the demurrer of defendant is sustained and the judgment herewith enclosed ordered entered."

This opinion is not copied in the record, and is no part of the judgment, but it is conceded by appellant that this is the view which was entertained by the lower court, and which actuated said court in rendering the judgment appealed from. With this opinion, we do not fully concur.

For a number of years prior to 1910, the books used in the common schools of this State were selected by the county judge, the county attorney and the county superintendent of schools of each county.

This manner of selecting the text books of the schools of the State never seemed to be satisfactory, and the Legislature of 1910 attempted to improve conditions by the enactment of chapter 13 of the Acts of 1910, approved March 15, 1910, which provided for the creation of a county text book commission in each county, consisting of the county superintendent of schools, two members of the Board of Examiners, the Principal of a high school in the county, and one member of the County Board of Education. These commissions were authorized to adopt a uniform series of text books for use in their respective counties, but under this Act each county in the State could have a different series of text books.

While this method was probably an improvement upon the former plan, there seems to have been a demand for further improvement and for a more general uniformity or an entire statewide uniformity in text books.

The act referred to, chapter 13 of the Acts of 1910, expressly provided that the Boards of Education in cities of the first, second, third, fourth, fifth and sixth classes, should constitute the text book commission for such cities, and as such, its powers and duties should be iden-

tical with those provided by law for county text book commissions.

It was with the law in this condition that the Legislature of 1914 enacted the act of March 9, 1914, here in question.

1. It is the first contention of appellant that the act violates section 51 of the Constitution and is therefore void, for the reason that the title is in direct conflict with the body of the Act.

The title of the Act is as follows:

"An Act creating a State Text Book Commission to adopt for use in the common schools of Kentucky a uniform series of text books, regulating the price thereof, defining the powers and duties of said commission and the method of selection of such text books and their distribution, prescribing penalties for the violation of this Act, and repealing chapter 13 of the Acts of the General Assembly of Kentucky, approved March 15, 1910."

Section 7 contains the following language:

"It shall be the duty of the said commission in the years in which existing contracts expire, by a majority vote of the entire commission, to adopt from the authorized State list of books submitted a uniform series or system of text books for use in the common schools and the high schools of the State, except in cities of the first, second, third and fourth classes."

Section 8 of the Act is as follows:

"The provisions of this act shall not apply to boards of education in cities of the first, second, third and fourth class; but the Act of 1910 regarding cities of the first, third and fourth class, and the Act of 1912 regarding cities of the second class shall be and remain in force unaffected by this act."

It will thus be seen that the title states that chapter 13 of the Acts of 1910 is repealed, while in the body of the Act, in section 8, it is provided that that chapter shall remain in force as to cities of the first, third and fourth classes.

Appellees argue that the act would be rendered harmonious in all its parts by striking out section 8 and that portion of section 7 which refers to cities of the first, second, third and fourth classes, leaving the remainder of the Act in complete harmony and constitutional in every respect, and that this should be done. But, under the rule that the constitutionality of an act must be sus-

tained, if possible, without doing violence to the manifest legislative purpose (which rule applies with like force to all the parts of the act), and the rule that conflicting provisions of the act should be reconciled, if possible, without disregarding the intent of the Legislature, section eight and that portion of section seven mentioned, should be permitted to remain, if that can be done.

Section 51 of the Constitution provides that no law enacted by the General Assembly shall relate to more than one subject, and that that subject shall be expressed in the title.

This section of the Constitution has always been liberally construed, all doubts being resolved in favor of the validity of the legislative action.

The purpose of this constitutional provision is the prevention of surreptitious legislation; as said in Cooley on Constitutional Limitations, "to prevent surprise or fraud upon the Legislature by means of provisions in bills, of which the titles gave no intimation, and which might, therefore, be overlooked and carelessly or unintentionally adopted."

So, having in mind the purpose of this provision, and the evil against which it is aimed, before an act of the General Assembly should be nullified by this court upon the ground that the subject of the act is not expressed in the title by reason of a variance between the title and the body of the act, it should be made to appear, and the court should be satisfied, that the variance complained of is such as to bring it within the range of the evils sought to be guarded against, and such as to justify its condemnation upon that ground alone. There is no such variance here. A casual reading of the title of this act could have misled no one, for, even if interested in the subject, it would have been necessary for such person to have learned what chapter 13 of the Acts of 1910 contained before he would understand the effect of the part of the title which states that chapter 13 of the Acts of 1910 is repealed; and any one interested to that extent, would also be sufficiently interested to read the body of the act itself.

Section 51 of the Constitution requires that the title shall express the subject legislated upon; but there is no requirement that the title of an Act shall also undertake to state what former acts are thereby repealed. Such a requirement would not only be unreasonable; it would

be impracticable; and it would lay upon the Legislature the duty of weighing the legal effect of prior legislation and determining just what legislation is repealed by the act proposed.

The title of the act in question fully expresses the subject of the act, excluding that part of the title which states that chapter 13 of the Acts of 1910 is repealed; and it being unnecessary that the title of the act should state what former legislation is thereby repealed, that part of the title which states that chapter 13 of the Acts of 1910 is repealed is surplusage, and may be disregarded.

Where the variance between the title and the body is not such as to create a strong inference that it has resulted in the enactment of legislation under misapprehension by the Legislature, and where the surplusage or apparent error in the title of the act is in regard to a particularity not required by the Constitution, it will not invalidate the statute, and such apparent error or surplusage in the title may be disregarded. (See 36 Cyc., 1033, and authorities cited.

Of course, where the entire title, or the essential part thereof, is in conflict with the body of the act, there is a failure to conform to section 51 of the Constitution, for in such case, the title does not express the subject of the act. But, in the title of the act in question, that part which states that chapter 13 of the Acts of 1910, is not only surplusage, it is also apparently erroneous, as is shown by a consideration of the legislative intent.

As to the intent of the Legislature with respect to this seeming conflict between the title and section 8 and part of section 7, there can be no uncertainty.

Doubtless the draftsman of the title of the act expected to have enacted a law which would give a uniform system of text books throughout the entire State, including cities of all classes; and while that part of the title referred to is of no importance in construing the act or in affecting its validity, it may nevertheless have served a purpose intended by the Constitution by giving notice to the members of the Legislature that the bill was intended to apply to the whole State without excluding any of the cities mentioned in the former act. If it did this, it served no bad purpose. That such notice was given and that the full purpose of the bill was understood by all, there can be no doubt. Nor can there be any doubt

that the intent of the Legislature or those voting for the act, is plainly expressed in sections 7 and 8, when read together; and the intention is clear that no part of the act should apply to cities of the first, second, third and fourth classes.

This being conceded, then the latter part of section 8, which seems to be a cause of complaint, is of no importance, for with or without these provisions, not only the "Act of 1910 regarding cities of the first, third and fourth class and the Act of 1912 regarding cities of the second class," remained in force unaffected by the act here in question, but all other legislation in effect at that time relating to those cities also remained in force and unaffected thereby.

The mere fact that section 8 may be divided into two parts, the first saying that the old law shall remain in force unaffected by the new; and the second saying that a part of the old law shall remain in force, without saying that the remainder shall not remain in force, can not re-enact the part of the former law referred to, nor repeal that part of the old law to which reference is not made. The only part of section 8 which has any force, is that part which, read in connection with section 7, provides that the provisions of the present act shall not apply to cities of the first, second, third and fourth classes.

Viewing the act in this light, then, to dispose of the contention of appellant that the act is void because of the conflict between the title and the body of the act, or because the legislative intent as to the cities mentioned can not be ascertained, it it only necessary to determine whether that part of the title of the act which refers to chapter 13 of the Acts of 1910 actually repeals that chapter in all respects. When the title is read in connection with sections 7 and 8, there can be no doubt that the act repeals all of that chapter except as to its application to cities of the first, second, third and fourth classes, or the whole of the act in effect so declares; and the last section in express words declares repealed all laws in conflict with the provisions of the act. But unless the title can write into the act a thing which it does not contain, but which on the other hand it expressly and in plain language provides against, then chapter 13 of the Acts of 1910 is not wholly repealed.

It is a well-settled rule that the Act can not contain matters not germane to the subject of the act as expressed in the title thereof, but does it necessarily follow that because an act can not go beyond the title, it may not fall short of it?

If an act itself is ambiguous, then the title may very properly and should be looked to in construing the meaning thereof; but when there is no ambiguity in the meaning of the act and it is not otherwise defective, the title should not be allowed to override the plainly expressed provisions of the act and to read into the act something that was not intended by those enacting it.

After striking out, or disregarding that part of the title which states that chapter 13 of the Acts of 1910, is repealed, the title of the act in question is full, explicit, sufficient and complete, and harmonizes with the body of the act. That part of the title is surplusage and should, therefore, be disregarded.

We have been referred to no authority in conflict with this construction. In the authorities cited by appellant where the act was held to be unconstitutional (Weimer v. Commissioners, 124 Ky., 377; Commonwealth v. Barney, 115 Ky., 475; Board of Trustees v. Tate, 155 Ky., 296, the body of the act was broader than the title; here it is contended that the body of the act is narrower than the title. In those cases, the body of the act was so extended as to include therein subjects not expressed by the title. Here, the body of the act does not go as far as the title would indicate. However, in all those authorities, it will be found that the constitutional provision is held to confine the body of the act within the scope of the subject expressed by the title, not to declare that the title controls when in conflict with the body of the act.

In Commonwealth v. Barney, *supra,* it is said.

"It (the title) is, therefore, not only useful in affording a fair index of the legislative intent in cases of ambiguity in the context, but it must be read in connection with the remainder of the act, as a part of it, in determining the law."

And, in Joyce v. Wood, 78 Ky., 386, cited by appellant, it is said:

"Instead of its being the duty of the courts to disregard the title, they are compelled by the Constitution to consider both the body and the title in order to arrive at the legislative intent."

This is in accord with the conclusions we have reached in the case at bar. Should the title alone be considered, it might be clear that chapter 13 of the Acts of 1910 was repealed as a whole; but when both body and title are considered together, the legislative intent is made clear, and the act will be construed to conform thereto.

2. It is also contended that the Act is unconstitutional because it imposes certain conditions impossible of fulfillment by the majority of the publishers of text books and thereby unreasonably restricts the bidding for the furnishing of books for use in the schools.

Section 14 provides that the retail dealers shall receive fifteen per cent of the retail price. Section 11 requires that the retail price in this State shall not exceed the retail price of the same book in other States; while section 18 requires that the wholesale price shall not be higher in this State than elsewhere.

It is claimed that it would therefore be impossible for many publishers to comply with our law without forfeiting their bonds in other states, because, by paying the dealers in this State fifteen per cent, based on the retail price, whereas in other States they pay the retail dealer less, would necessarily cause the books to be sold higher in this State than in other States; and that under this state of case, if the retail prices in this and other States are made the same, then the wholesale prices in this State must be lower than in those States where less than 15% is paid the retail dealer; and that under these conditions, many publishers will be prohibited from bidding.

However, section 14, in so far as it fixes the compensation of the retail dealer, may upon a proper showing made to it, be made by the Commission, to yield to the other provisions of the Act and to the fair exigencies of the situation.

The one demand for this legislation, the one purpose sought to be accomplished, the one intent of those favoring the Act, was to protect the consumer, to procure for the users of school text books the lowest prices for which such books could be sold anywhere. The object of the Legislature was to benefit the last purchaser—the people. The law was enacted in the interest of this class, and of this class alone.

The Legislature fully understood that the publishers and the retail dealers could take care of themselves without any assistance from the law-making power, if it should be conceded that the law-making power could legally assist them; and that no provision of the act was intended to advance the interest of either .

Looked at from any angle, it will readily be seen that the advocates of the law were apprehensive that the people would be imposed upon by those who controlled the furnishing of such books whether such apprehension was well-founded or not. And, it was in the interest of the public that the law was enacted. It can not be thought that the Legislature in the effort to procure for the people school books at the lowest prices, intended to limit the rights of parties to contract or to interfere with any contract entered into between the Commission, the publishers and the dealers, provided such contract did not serve to defeat the purpose for which the law was enacted. To construe the act to mean that the retail dealer could not as his profit agree to accept five per cent of the retail price agreed upon between the publisher and the Commission, that he must accept fifteen per cent, and that it would violate the act to pay him less, would be to say that the legislation was enacted in the interest of the dealer, to the injury of the consumer; because the publisher in bidding on the contract must take into consideration and add to his bid the difference between the five and the fifteen per cent, and this difference must therefore be added to the price the publisher expects to receive from the dealer and the price the consumer would be required to pay; and this would be in direct conflict with the purpose of the act.

But, if we look solely to the intent of the Legislature, it is not difficult to harmonize this suggested trouble by construing the act to mean that the parties, in entering into the contract to supply the public with text books may understand that the retail dealer may charge nothing for his services in the distribution of books to the public if he so desires, but must also understand that if he charges anything, it must not exceed fifteen per cent of the retail price; that the law will not arbitrarily fix the amount he must charge and thereby abridge his right to underbid another dealer for the contract, but that if a charge is made by him, it must not exceed fifteen per cent of the retail price. This would do no violence to the Act or the

claim of any one interested, but would probably be of great benefit to the public and carry out the purpose and intention of the act.

It is well settled in this State that where words used in a statute do not convey the meaning intended by the Legislature and where from the context and a general survey of the attending circumstances and a consideration of the object sought to be accomplished, the true intention is apparent, the words may be modified so as to express the legislative intent.

In Morrel Ref. Car Co. v. Commonwealth, 128 Ky., 455, the court said:

"We had occasion to review at some length the question when and how far the courts are justified in expanding or contracting, adding to or subtracting from the language of a statute in order to preserve the integrity of the law, as in the case of Commonwealth v. Rosenfield Bros. & Co., 118 Ky., 374, 26 R., 726, 80 S. W., 1178, 82 S. W., 433, and we said on this subject in the opinion: "The cardinal rule of statutory construction is that the intent of the Legislature shall be effectuated even at the expense of the letter of the law; and, to accomplish this the meaning of words may be modified, the structure of sentences changed, or some words rejected altogether and others interpolated. Endlich in his work on the Interpretation of Statutes, section 295, thus states the rule: "Where the language of a statute in its ordinary meaning and grammatical construction leads to manifest contradiction of the apparent purpose of the enactment, or to some inconvenience or absurdity, hardship or injustice, presumably not intended, a construction may be put upon it which modifies the meaning of the words, and even the structure of the sentence. This is done sometimes by giving an unusual meaning to particular words, sometimes by altering their collocation or by rejecting them altogether, or by interpolating other words, under the influence, no doubt, of an irresistible conviction that the Legislature could not possibly have intended what its words signify, and that the modifications thus made are mere corrections of careless language, and really give the true intention. The ascertainment of the latter is the cardinal rule, or rather the end and object of all construction; and, where the real design of the Legislature in ordaining a statute, although it be not precisely expressed, is yet plainly perceivable or ascertained with

reasonable certainty, the language of the statute must be given such a construction as will carry that design into effect even if in so doing the exact letter of the law be sacrificed or though the construction be, indeed, contrary to the letter.''

In Commonwealth v. Herald Pub. Co., 128 Ky., 432, this court said:

''Section 1352 is said to be meaningless and uncertain because there is contained in it no prohibition against the things mentioned in the section, nor is it declared that it shall be unlawful to do them. In the respects mentioned, the section is technically defective, but there can be no reasonable doubt that it was the intention of the Legislature to make it unlawful to commit the acts mentioned, and to prohibit any person or corporation from doing the forbidden things. The intent of the section being clear, the purpose of its enactment being plain, it will not be allowed to fail because of the omission of the words 'It shall be unlawful for,' which should have been placed at the beginning of the section, or the words shall be guilty of the offense,' which should have been added to the section . In Sams v. Sams' Admr., 85 Ky., 396, 9 R., 24, 3 S. W., 593, the court said: It is a well settled rule of construction that the letter of a statute will not be followed when it leads to an absurd conclusion; but, on the contrary, the reason for the enactment must enter into the interpretation, so as to determine what was to be accomplished by it.'' This court has frequently inserted words in a statute, and has often modified expressions for the purpose of carrying out the legislative intent, when it was apparent from a reading of the statute that the omission of words or their insertion in the wrong place was merely an error. Commonwealth v. Grinstead, 108 Ky., 59, 55 S. W., 720, 21 R., 1444; Bird v. Commissioners, 95 Ky., 195, 24 S. W., 118, 15 R., 578; Maysville, etc. v. Herrick, 13 Bush, 123. Nor will this statute be held insufficient to punish violators of it. The omitted words necessary to perfect it will be supplied in accordance with the settled rules of statutory construction.''

With these principles in mind, there is no difficulty in such an administration of the law in question as will render it possible of fulfillment by all publishers having reasonable contracts in other States, and such as will place no restriction upon the bidding for the furnishing

of books under the act. If the Commission upon a proper showing see fit to require it of the retail dealer, he may accept less than 15% of the retail price as his compensation, and the publisher thus be enabled to comply with his contracts and the laws of other States. The difficulties in administering the law with these principles in view are not so great as to render the act impracticable or uncertain.

The court, therefore, holds that the act in question is constitutional; that so far as affected by this act, all laws respecting cities of the first, second, third and fourth classes, which were in force at the time of its passage, are still in force and unaffected by anything contained in the act in question; and that in fixing the compensation of the retail dealer, the basis shall be the retail price, but the Commission and the parties may fix the compensation of the retail dealer in any amount so that it does not exceed fifteen per cent of the retail price.

The judgment of the circuit court sustaining the demurrer and dismissing the petition is affirmed.

Whole court sitting.